346 F.3d 84
 State of CONNECTICUT, on the relation of Richard BLUMENTHAL in his capacity as Attorney General of the State of Connecticut, Plaintiff-Counter-Defendant-Appellee,
Vivian I. Volovar, Plaintiff-Appellee,
v.
Erin M. CROTTY, in her official capacity as Commissioner, Department of Environmental Conservation*, John P. Cahill, individually, Donald W. Brewer, individually and in his official capacity as Director, Department of Environmental Conservation, Division of Law Enforcement, Defendants-Counter-Claimants-Appellants,
Gordon C. Colvin, individually and in his official capacity as Director, Department of Environmental Conservation, Marine Resources Division, Richard M. Otterstedt, individually and in his official capacity as Environmental Conservation Officer, Gary A. Enright, individually and in his official capacity as Environmental Conservation Officer, New York State, New York State Department of Environmental Conservation, Defendants-Appellants,
State of Connecticut, Amicus Curiae,
Fishers Island Lobstermen's Association, Inc., Fishers Island Conservancy, Inc., Movant-Amici Curiae.
 Docket No. 01-7325(L).
 Docket No. 01-7333(CON).
 United States Court of Appeals, Second Circuit.
 Argued: January 10, 2002.
 Decided: September 30, 2003.
 
 COPYRIGHT MATERIAL OMITTED MARK P. KINDALL, Assistant Attorney General, Hartford, CT. (Richard Blumenthal, Conn. State Attorney General, Hartford, CT., on the brief) for Plaintiff-Counter-Defendant-Appellee and Amicus Curiae State of Connecticut.
 GEORGE M. PURTILL, Purtill, Purtill & Pfeffer, South Glastonbury, CT., (Seth Jacoby, Purtill, Purtill & Pfeffer, on the brief) for Plaintiff-Appellee Vivian I. Volovar.
 GREGORY J. NOLAN, Assistant Attorney General, New York, N.Y., (Eliot Spitzer, N.Y. State Attorney General, Michael Belohlavek, Assistant Solicitor General, Gordon J. Johnson, Assistant Attorney General, New York, N.Y., on the brief) for Defendants-Counter-Claimants-Appellants Erin M. Crotty, John P. Cahill and Donald W. Brewer and Defendants-Appellants, Gordon C. Colvin, Richard M. Otterstedt, Gary A. Enright, and New York State
 STEPHEN S. MICHAELS, Debevoise & Plimpton, New York, N.Y. (Robert M. Dickson, Debevoise & Plimpton, New York, N.Y., on the brief) for Movant-Amici Curiae Fishers Island Lobstermen's Association, Inc. and Fishers Island Conservance, Inc.
 PETER C.L. ROTH, Assistant Attorney General, Concord, N.H. (Philip T. McLaughlin, N.H. State Attorney General, Concord, N.H., G. Steven Rowe, M.E. State Attorney General, Augusta, M.E., Mark A. Randlett, Assistant Attorney General, Augusta, M.E., Gary Powers, Deputy. Chief Legal Counsel, R.I. Department of Environmental Management, Wakefield, R.I., on the brief) for Amici Curiae State of New Hampshire, State of Maine, and State of Rhode Island.
 Before: WALKER, Chief Judge, F.I. PARKER** and SOTOMAYOR, Circuit Judges.
 F.I. PARKER, Circuit Judge.***
 
 
 1
 This appeal represents a repeat appearance by a number of the parties before this Court in connection with a challenge to a specific provision in New York's Environmental Conservation Law (also known as the "Fish and Wildlife Law"): the restrictions imposed on nonresident lobstermen who obtain a New York commercial lobstering permit, set forth at N.Y. Envtl. Conserv. Law, section 13-0329(2)(a) (McKinney 1997 & Supp.1999) (the "Nonresident Lobster Law"). In contrast to the previously-resolved threshold jurisdictional questions presented to this Court, see generally Connecticut ex rel. Blumenthal v. Cahill, 217 F.3d 93 (2d Cir.2000) ("Cahill I"), the instant appeal implicates constitutional questions pertaining to the validity of the Nonresident Lobster Law itself.
 
 
 2
 Defendants-Counter-Claimants-Appellants Erin M. Crotty ("Crotty"), the current Commissioner of New York State's Department of Environmental Conservation ("NYSDEC"), John P. Cahill ("Cahill"), the former NYSDEC Commissioner, and Donald W. Brewer ("Brewer"), Director of the NYSDEC's Law Enforcement Division, as well as Defendants-Appellants Gordon C. Colvin ("Colvin"), Director of NYSDEC's Marine Resources Division, Richard M. Otterstedt ("Otterstedt") and Gary A. Enright ("Enright"), both NYSDEC Environmental Conservation Officers, and the State of New York ("New York"), (collectively "Appellants"), bring the instant appeal. Appellants seek review of a grant of summary judgment by the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., Judge), entered on February 6, 2001, in favor of Plaintiff-Counter-Defendant-Appellee State of Connecticut ("Connecticut") and Plaintiff-Appellee Vivian I. Volovar ("Volovar") (collectively "Appellees"), and a denial of Appellants' cross-motion for summary judgment. The district court granted summary judgment in accordance with the reasoning set forth in its Memorandum-Decision and Order ("Order") issued February 2, 2001. Connecticut, ex rel. Blumenthal v. Cahill, 98-CV-575, 99-CV-718 (FJS/DRH) (N.D.N.Y. Feb. 2, 2001) ("Cahill II").
 
 
 3
 In granting summary judgment for Appellees, the district court ruled that the Nonresident Lobster Law violates the Commerce Clause, the Privileges and Immunities Clauses, and the Equal Protection Clause of the United States Constitution. Finding the Nonresident Lobster Law unconstitutional, the district court granted Appellees' requests to enjoin its enforcement. The district court also ruled that the Appellants who were sued in their individual capacities were not entitled to qualified immunity and awarded Appellee Volovar monetary relief, the amount of which was to be determined at a subsequent trial on damages.
 
 
 4
 We agree with the district court that the Nonresident Lobster Law, on its face and as applied, violates the Privileges and Immunities Clause of Article IV, Section 2, Clause 1, of the United States Constitution, as alleged by Appellee Volovar. We, therefore, affirm the district court's grant of summary judgment for Appellee Volovar based on that portion of the Order finding the Nonresident Lobster Law unconstitutional on its face and as applied and enjoining its enforcement. Finding the Nonresident Lobster Law facially unconstitutional under the Privileges and Immunities Clause obviates the need to address Appellee Connecticut's Commerce Clause challenge, which is mooted by our holding. Regarding Appellee Volovar's claim for monetary damages, we disagree with the district court's conclusion that the individual Appellants are not entitled to qualified immunity. We, therefore, reverse the district court's judgment insofar as it pertains to Appellee Volovar's damages claim and enter summary judgment for the individually-named Appellants on qualified immunity grounds.
 
 I. BACKGROUND
 
 5
 A. The Nonresident Lobster Law: Environmental Conservation Law § 13-0329(2)(a)
 
 
 6
 As we previously noted in Cahill I, the relevant facts are undisputed. 217 F.3d at 96. The Nonresident Lobster Law provides that:
 
 
 7
 A person not domiciled within the state but who is domiciled in a state that provides reciprocal permits or licenses to persons domiciled in New York State may, upon first obtaining a permit from the department, take and land lobsters only from the waters of the state westerly and southerly of a straight line drawn from the Flashing Green Light Number 9 Whistle Buoy at Cerebus Shoals (located approximately seven miles northwesterly to Montauk Point) northwesterly to Race Rock and thence due north to the New York-Connecticut interstate boundary line; and may land lobsters taken outside New York state waters.
 
 
 8
 N.Y. Envtl. Conserv. Law, § 13-0329(2)(a) (emphasis added). Thus, the Nonresident Lobster Law creates, among other things, a two-tiered system for commercial lobstering. Lobstermen residing in New York and those residing in States — including Connecticut — that provide reciprocal permits or licenses to New York residents may obtain New York commercial lobstering permits. However, even if granted a permit, non-residents of New York may not take lobsters from a designated area of New York waters in Long Island Sound near Fishers Island (the "Restricted Area"). See N.Y. Envtl. Conserv. Law § 13-0329(1), (2)(a). Fishers Island lies between Block Island Sound and Long Island Sound near the eastern Connecticut coastline, but is part of the State of New York. The record suggests that the Restricted Area provides an exceptionally fertile lobster bed. On this record, it appears the Nonresident Lobster Law, which has been in effect in its current form since 1964,[1] was continually enforced without challenge until 1997.[2]
 
 B. The Parties
 
 9
 During all pertinent periods in this litigation, Appellant Cahill served as the New York State Commissioner of Environmental Conservation and Appellant Brewer served as NYSDEC's Director of the Division of Law Enforcement. Appellant Colvin served as NYSDEC's Director of Marine Resources Division. Appellants Otterstedt and Enright both served as NYSDEC Environmental Conservation Officers. It is undisputed that, during all pertinent times, the individual Appellants, by virtue of their official positions, were responsible for enforcing the Nonresident Lobster Law.[3]
 
 
 10
 Appellee Volovar is a Connecticut resident and a commercial lobsterman.[4] Since 1978, Volovar has been licensed to take and land lobsters in Connecticut. Pursuant to the Nonresident Lobster Law, Volovar obtained a permit in 1984 to take and land lobsters in the vast majority of New York waters other than the Restricted Area. Appellee Connecticut became involved, acting in parens patriae, on behalf of its own resident lobstermen, including Appellee Volovar[5], to challenge the Nonresident Lobster Law's permitting restrictions that placed Connecticut lobstermen at a competitive disadvantage relative to New York lobstermen.
 
 
 11
 Involved in this action as Amici Curiae are the Fishers Island Lobstermen's Association, Inc. ("FILA") and the Fishers Island Conservancy, Inc. ("FIC") (collectively "Fishers Island Amici"). According to its brief, FILA is a for-profit corporation incorporated in 1966 with membership consisting of commercial and recreational lobster permit holders residing on Fishers Island. FILA's purported interest in this action stems from its long history, pursuant to the Nonresident Lobster Law, of managing and conserving the lobster resource in waters around Fishers Island from depletion. FIC, on the other hand, is a non-profit corporation founded in 1985 that supports the lobster conservation efforts around Fishers Island, including enforcement of the Nonresident Lobster Law.
 
 
 12
 Additional Amici include the States of Maine, New Hampshire, and Rhode Island (collectively "State Amici"), each of which currently enforces one or more statutes similar to New York's Nonresident Lobster Law that limit the right of nonresidents to take lobsters within the territorial waters of each respective State. See Me. Rev.Stat. Ann. tit. 12 § 6421 (West 1997); N.H.Rev.Stat. Ann. § 211:23 (1977); R.I. Gen. Laws § 20-2-24 (1992).
 
 
 13
 C. Concerns About Enforcing the Nonresident Lobster Law
 
 
 14
 In or about early 1997, Appellants began examining more closely the enforceability of the Nonresident Lobster Law. In a May 9, 1997 memo to Appellant Brewer, Appellant Otterstedt communicated concerns about the constitutionality of permitting restrictions in the Nonresident Lobster Law. Otterstedt's concerns stemmed from an Attorney General's determination that a durational residence requirement in a similar statute, N.Y. Envtl. Conserv. Law § 13-0311(1) ("Nonresident Shellfish Law"), restricting shellfish permits to New York residents was unconstitutional.[6] In light of a challenge to the Nonresident Shellfish Law, Appellant Otterstedt expressed concern, but continued uncertainty, about possible ramifications of enforcing the Nonresident Lobster Law. He therefore sought "final written guidance on this issue" from NYSDEC, his employer.
 
 
 15
 On July 31, 1997, Appellant Brewer, on behalf of NYSDEC, responded to Appellant Otterstedt's May 9, 1997 memo. Appellant Brewer stated that he had consulted with an Assistant Attorney General and been informed that the enforcement policy regarding the Nonresident Lobster Law would "fall based on the unconstitutional residence requirement of the previously adjudicated case."[7] It is unclear whether enforcement of the Nonresident Lobster Law temporarily ceased as of that day. It is undisputed, however, that by early November 1997, NYSDEC informed Appellee Volovar and others that it would halt enforcement of the Nonresident Lobster Law.
 
 
 16
 On November 25, 1997, Appellant Colvin sent a letter to FILA explaining that the permitting restrictions in the Nonresident Lobster Law imposed on nonresidents of New York were not being enforced. Colvin stated that this decision was "based on [NYSDEC's] determination that this provision of the law is unconstitutional in that it discriminates on the basis of domicile, and denies citizens of another state a privilege enjoyed by citizens of New York." Still, at that time (and continuing until the district court ruling in this case), no judicial ruling or legislative action invalidating the Nonresident Lobster Law had occurred.
 
 
 17
 D. A December 15, 1997 Meeting Precipitates Renewed Enforcement Efforts
 
 
 18
 On December 15, 1997, Assemblywoman Patricia Acampora, who represents New York's First Assembly District covering Fishers Island, convened a meeting between NYSDEC officials and attorneys and numerous Fishers Island resident lobstermen to discuss enforcement of the Nonresident Lobster Law. Also present at the meeting were an aide from the office of State Senator Kenneth LaValle, who represents New York's First Senatorial District covering Fishers Island, and an attorney from the New York Attorney General's office. The full extent of the meeting's discussions is unclear, but the record contains handwritten notes that, albeit cryptic, purportedly memorialize specific topic areas discussed.[8]
 
 
 19
 According to the handwritten notes, Assemblywoman Acampora indicated to NYSDEC officials present at the meeting that Fishers Island lobstermen intended to bring a legal action against the State of New York and NYSDEC in order to compel enforcement of the Nonresident Lobster Law.[9] The notes also suggest that those attending the meeting discussed the facts that the number of nonresident commercial lobstermen from Connecticut seeking access to the Restricted Area was minimal,[10] that the Fishers Island residents agreed to impose a voluntary pot limit,[11] and that all were in agreement regarding a "lobster conservation area approach." In a memo dated the same day, Appellant Brewer instructed Appellant Otterstedt and NYSDEC enforcement officers to recommence enforcement of the Nonresident Lobster Law. NYSDEC officials began immediately patrolling the Restricted Area for nonresident commercial lobstermen.
 
 
 20
 The next day, on December 16, 1997, a NYSDEC enforcement officer warned Appellee Volovar that her lobster fishing gear would be confiscated if she continued lobstering in the Restricted Area. On December 19, 1997, Appellant Otterstedt circulated a memo to various NYSDEC officials regarding the renewed enforcement efforts of the Nonresident Lobster Law. Thereafter, NYSDEC officers ticketed and fined nonresident lobstermen, including Appellee Volovar, for taking lobsters from the Restricted Area.
 
 E. Challenging the Nonresident Lobster Law
 
 21
 Connecticut filed an action in the United States District Court for the Northern District of New York on April 8, 1998. In its capacity as parens patriae, Connecticut sought a declaration that the Nonresident Lobster Law was facially unconstitutional under the Commerce Clause because it discriminated against nonresidents of New York in the pursuit of an interstate commercial activity. Connecticut also sought an injunction prohibiting Appellants from enforcing the restriction. Appellants initially filed counterclaims challenging similar Connecticut permitting statutes, but later discontinued them. The parties filed cross-motions for summary judgment, arguing both the merits of the constitutional issue and the question of whether the district court had subject matter jurisdiction over the action.
 
 
 22
 In an unpublished decision, the district court ruled that New York was the sole real defendant-party in interest. See Connecticut ex rel. Blumenthal v. Cahill, 98-CV-575 (Mem.) (FJS/DRH) (N.D.N.Y. June 1, 1999). Citing 28 U.S.C. § 1251(a), the district court then dismissed for lack of subject matter jurisdiction as a "controvers[y] between two or more States" within the Supreme Court's exclusive original jurisdiction. Id. at 10. The district court also denied as moot Appellee Volovar's motion to intervene. Id. Appellee Volovar subsequently brought her own action against the Appellants. See Volovar v. Cahill, No. 99-CV-718 (FJS/DRH) (N.D.N.Y. filed May 5, 1999).
 
 
 23
 On Connecticut's appeal of the dismissal to this Court, we held that Connecticut's claims did not implicate New York's core sovereignty interests and, therefore, section 1251(a) did not trump federal question jurisdiction in the lower courts. See Cahill I, 217 F.3d at 103-05. We concluded that the district court could properly exercise jurisdiction over Connecticut's claims for declaratory and injunctive relief; accordingly, the district court improperly dismissed the claims for want of subject matter jurisdiction. Id. at 104-05.
 
 
 24
 On remand, the Connecticut case and the Volovar case were consolidated. Appellee Connecticut filed a motion for summary judgment, and Appellee Volovar filed a motion for partial summary judgment. As earlier indicated, the district court granted both motions, invalidating the Nonresident Lobster Law; denied qualified immunity to Appellants; denied Appellants' cross-motion for summary judgment; and scheduled a jury trial for the determination of Appellee Volovar's monetary damages claim. This timely appeal followed.[12]
 
 II. DISCUSSION
 
 25
 At the heart of this appeal is the question whether the Nonresident Lobster Law runs afoul of the United States Constitution. In addressing this question, we observe the longstanding prudential principle of statutory interpretation that compels us to construe a statute to avoid any constitutional questions unless such construction is plainly contrary to the legislative intent. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). For the reasons stated below, we can discern no reasonable construction consistent with legislative intent that would render the Nonresident Lobster Law consonant with the Constitution. As we discuss more fully below, the Nonresident Lobster Law, on its face and as applied, violates the Privileges and Immunities Clause of Article IV of the United States Constitution.
 
 
 26
 This appeal also raises the question of the appropriate scope and breadth of immunity from personal liability a State official can expect when he/she enforces a statute that is in effect at the time of enforcement, but is later ruled unconstitutional. We hold that, generally, such a factor weighs substantially, though not decisively, in favor of qualified immunity and, under the facts of this case, Appellants are entitled to qualified immunity.
 
 
 27
 Accordingly, we affirm that portion of the district court's grant of summary judgment to Appellee Volovar on her constitutional challenge to the Nonresident Lobster Law. Because our holding invalidates the Nonresident Lobster Law on its face and as applied, Appellee Connecticut's facial Commerce Clause challenge is moot. See Associated Gen. Contractors of Conn., Inc. v. City of New Haven, 41 F.3d 62, 65 (2d Cir.1994) ("mootness doctrine prevents federal courts from hearing matters that no longer present an actual dispute between parties."). We reverse that portion of the district court's grant of summary judgment pertaining to personal liability of the individual Appellants and enter summary judgment in favor of the individual Appellants on qualified immunity grounds.
 
 A. Standard of Review
 
 28
 This Court reviews a district court's grant of summary judgment de novo. Singer v. Fulton County Sheriff, 63 F.3d 110, 114 (2d Cir.1995). Summary judgment is appropriate when "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Claims turning entirely on the constitutional validity or invalidity of a statute are particularly conducive to disposition by summary judgment as they involve purely legal questions.
 
 
 29
 B. The Nonresident Lobster Law Violates the Privileges and Immunities Clause
 
 
 30
 Appellee Volovar challenged the Nonresident Lobster Law as violative of, among other things, the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution. Volovar maintained below, and reiterates on appeal, that the Nonresident Lobster Law discriminates against her and other nonresident lobstermen seeking to pursue their livelihood in the Restricted Area. Volovar sought declaratory and injunctive relief similar to the relief Connecticut sought (as well as money damages, her entitlement to which we discuss in Section C, below). Appellants counter that the activity in which Volovar and other nonresident lobstermen seek to participate involves the exploitation of natural resources, an activity in which no person has a constitutional right to engage. Appellants further argue that the Nonresident Lobster Law is justified by geographic necessity. The district court ruled in favor of Volovar and rejected Appellants' attempts to frame the issue as anything other than a regulation impeding an individual's right to pursue a livelihood. For the reasons stated below, we find the district court ruled correctly.
 
 
 31
 1. Privileges and Immunities Clause, Generally
 
 
 32
 The Privileges and Immunities Clause of Article IV provides that "[t]he citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. As an initial matter, we note the common thread among Commerce Clause and Privileges and Immunities Clause analyses based on their "mutually reinforcing relationship... stem[ming] from their common origin in the Fourth Article of the Articles of Confederation ... and their shared vision of federalism...." Hicklin v. Orbeck, 437 U.S. 518, 531-32, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (citation omitted). Intended to protect against State discrimination against a national market concept, "the Commerce Clause circumscribes a State's ability to prefer its own citizens in the utilization of natural resources found within its borders, but destined for interstate commerce." Id. at 533, 98 S.Ct. 2482. Likewise, intended to foster a national economic union, the Privileges and Immunities Clause of Article IV limits a State's power to discriminate against residents of other States with respect to the privileges and immunities that are "sufficiently basic to the livelihood of the Nation" and that "bear[] upon the vitality of the Nation as a single entity." Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 383, 388, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978); see also Supreme Court of N.H. v. Piper, 470 U.S. 274, 280, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985); Toomer v. Witsell, 334 U.S. 385, 395-96, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). With this parity of interest in mind, we acknowledge a substantial overlap in arguments raised by Appellants and the analogous support offered by dormant Commerce Clause cases to our Privileges and Immunities analysis. However, we rest our decision on the Privileges and Immunities Clause alone.
 
 
 33
 As a general rule, Privileges and Immunities Clause analysis requires us to consider (1) whether a State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens, and (2) if so, whether there is sufficient justification for the discrimination. United Bldg. & Constr. Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 218, 222, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). A "sufficient justification" can be shown by a State demonstrating (a) a substantial reason for the discrimination, and (b) a reasonable relationship between the degree of discrimination exacted and the danger sought to be averted by enactment of the discriminatory statute. Id. at 222, 104 S.Ct. 1020; see also Toomer, 334 U.S. at 396, 68 S.Ct. 1156. The availability of less restrictive means is considered when evaluating the measure and degree of the relationship between the discrimination and state interest. Piper, 470 U.S. at 284, 105 S.Ct. 1272.
 
 2. Discrimination Against Nonresidents
 
 34
 The Nonresident Lobster Law discriminates against nonresident commercial lobstermen (such as Appellee Volovar) by preventing them from pursuing their livelihoods in the Restricted Area. Quite simply, a nonresident commercial lobsterman may not obtain a permit to take and land lobsters in the Restricted Area while any and all resident commercial lobstermen may obtain such permits. The right to pursue a lawful calling has long been recognized as a fundamental right, see, e.g., Allgeyer v. Louisiana, 165 U.S. 578, 589, 17 S.Ct. 427, 41 L.Ed. 832 (1897) ("The `liberty' mentioned in [the Fourteenth Amendment]... is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; [and] to earn his livelihood by any lawful calling; to pursue any livelihood or avocation...."), and one that is protected by the Privileges and Immunities Clause, see Hicklin, 437 U.S. at 524, 98 S.Ct. 2482 (Clause protects nonresident against discriminatory regulation of ability "to ply their trade, practice their occupation, or pursue a common calling within the State."); United Bldg., 465 U.S. at 219, 104 S.Ct. 1020 ("Certainly, the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause.... Many, if not most, of our cases expounding the Privileges and Immunities Clause have dealt with this basic and essential activity.") (citations omitted).
 
 
 35
 The Supreme Court has invalidated State statutes that treat residents and nonresidents disparately in connection with the pursuit of commerce, a trade, or business venture where that disparate treatment is not supported by a sufficient justification. See, e.g., Supreme Court of Va. v. Friedman, 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (invalidating Virginia's residence requirement for admission without examination to State Bar); Piper, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (invalidating New Hampshire's residence requirement for admission to State Bar); Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (invalidating statute of territory of Alaska charging nonresident commercial fisherman ten times more for commercial fishing license than residents); Toomer, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (invalidating South Carolina statute requiring nonresident commercial shrimpers to pay one hundred times more for a commercial shrimp license than residents); Ward v. Maryland, 12 Wall. 418, 79 U.S. 418, 20 L.Ed. 449 (1870) (invalidating Maryland statute requiring only nonresident merchants to obtain license to practice their trade, charging higher fees to nonresident than to resident merchants, and prohibiting merchants from using nonresident salesmen to sell goods in Baltimore); cf. Baldwin, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) (holding Montana law charging nonresident elk hunters higher license fee than residents did not violate Privileges and Immunities Clause because elk hunting is a "recreation and a sport," not a commercial activity and, therefore, not a constitutional right or important economic activity). These holdings are grounded firmly in the notion that a State may not ordinarily impede an individual's right to travel from State to State to pursue a livelihood. Commercial lobstering is no exception. Cf. Toomer, 334 U.S. at 403, 68 S.Ct. 1156 (holding that "commercial shrimping in the marginal sea, like other common callings, is within the purview of the privileges and immunities clause.").
 
 
 36
 While the Nonresident Lobster Law does not impose an absolute bar to commercial lobstering by nonresidents in New York's waters, a wholesale bar has never been required in order to implicate the Privileges and Immunities Clause. See, e.g., United Bldg., 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (declaring unconstitutional a city ordinance requiring that at least forty percent of contractors' and subcontractors' employees on city construction projects be residents of the city). That Appellee Volovar and other nonresident lobstermen may obtain a permit to engage in commercial lobstering in all other New York waters does not diminish the constitutionally objectionable nature of the Nonresident Lobster Law. Insofar as the first prong of Privileges and Immunities analysis is concerned, it suffices that the Nonresident Lobster Law discriminates against nonresidents with respect to the privileges and immunities New York accords to its own citizens to engage in commercial lobstering within a specific geographic region of New York — the Restricted Area.
 
 
 37
 Appellants argue against application of Privileges and Immunities scrutiny, maintaining that the activity at issue involves the exploitation of a natural resource, not the pursuit of livelihood. Relying on Baldwin, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), Appellants argue that Appellee Volovar, "as a nonresident of New York, has no absolute right protected by the Privileges and Immunities clause to exploit a natural resource of New York, even in furtherance of her livelihood." Reliance on Baldwin is misplaced, however, as Baldwin involved a challenge to Montana's recreational elk hunting law that significantly favored residents over non-residents. While recognizing the continued validity of a State interest in protecting a natural resource, even through enactment of discriminatory legislation, the Supreme Court drew a clear line of demarcation between the fundamentally-protected nature of a nonresident's pursuit of a livelihood, and the minimally-protected nature of a non-resident's recreational pursuit. See Baldwin, 436 U.S. at 387-88, 98 S.Ct. 1852. Thus, statutes may regulate an activity in a discriminatory fashion in the interest of protecting a natural resource if participation in that particular activity is unrelated to pursuit of a livelihood. Baldwin did not enunciate an absolute rule permitting disparate treatment of nonresidents predicated entirely on a State interest in protecting a natural resource from "exploitation" even if commercial callings are affected. In our case, the Nonresident Lobster Law affects the lawful pursuit of a livelihood — commercial lobstering — rather than merely recreational activity and, therefore, implicates a constitutionally protected right.
 
 
 38
 Moreover, we question Appellants' characterization of the activity in which Appellee Volovar and other nonresident commercial lobstermen wish to engage as "exploitation" of a natural resource rather than pursuit of a livelihood. The facts are undisputed that Appellee Volovar sought to engage in a commercial venture in pursuit of her livelihood and we find no evidence that the manner in which she or other nonresident lobstermen sought to do so differed from that of resident lobstermen. Appellants seem to suggest that the principal activity implicated here is exploitation of a natural resource, while Appellee Volovar's pursuit of her livelihood represents only a secondary activity. We are not persuaded. A statutory scheme that places nonresidents at a competitive disadvantage for purposes of a common calling is sufficient to implicate Privileges and Immunities scrutiny.
 
 
 39
 The Nonresident Lobster Law here patently discriminates against nonresidents enjoying the privileges and immunities New York accords its residents. While New York undoubtedly has substantial interests in preserving and conserving its natural resources, its efforts in furtherance of this interest must nonetheless comport with constitutional principles of a national economic union and a nonresident's ability to participate in this arena on equal footing with residents. One — if not the principal — activity affected by the Nonresident Lobster Law — not by accident, but by design — is Appellee Volovar's pursuit of her livelihood. This should come as no surprise to Appellants, as Section 13-0329(1) (the "Resident Lobster Law") makes specific reference to commercial lobstering permits. The Nonresident Lobster Law, i.e., Section 13-0329(2)(a), relates back to Section 13-0329(1) and contemplates nonresident commercial lobstermen obtaining a permit for commercial lobstering in New York waters other than the Restricted Area.
 
 
 40
 Distinguished from Baldwin, then, the Nonresident Lobster Law's primary impact is on the pursuit of a livelihood, a fundamental right within the purview of the Privileges and Immunities Clause. The question then becomes whether Appellants provide sufficient justification to support the Nonresident Lobster Law, that is, a substantial reason for the discrimination and a reasonable relationship to the targeted harm. See United Bldg., 465 U.S. at 222, 104 S.Ct. 1020. Part and parcel to this analysis is determining whether Appellants have demonstrated a substantial factor unrelated to economic protectionism to justify the discrimination. See New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988).
 
 3. Insufficient State Interests
 
 41
 Appellants fail to proffer sufficient justification for the discrimination exacted by the Nonresident Lobster Law. We address, and reject, each of their arguments in turn.
 
 
 42
 
 a. Geographic Necessity
 
 
 
 43
 Appellants maintain that "geographic necessity" compels them to "insur[e] its lobsters ... are effectively available to those New York lobster fishers who reside on Fishers Island." The Nonresident Lobster Law appears predicated upon the fear that, in its absence, the much more numerous Connecticut and Rhode Island lobstermen will "effectively deprive New York and its citizens of the fruits of New York's management efforts." A more calculated exercise in economic protectionism would rarely present itself. As a manifestation of economic protectionism at the expense of nonresident lobstermen, the "geographic necessity" argument, as articulated by Appellants, is not a sufficient justification for the discrimination exacted on nonresidents.
 
 
 44
 Moreover, we note that Appellants' "geographic necessity" rationale presents only the most apocalyptic view of non-regulation, while ignoring that a readily identifiable and reasonably adequate manner of counter-balancing the numerosity of potential nonresident lobstermen would be the imposition of a non-discriminatory permit or lobster limitation. Contrary to Appellants' position, a lobstering free-for-all in the Restricted Area is not the necessary by-product of an effective challenge to the Nonresident Lobster Law. Geographic necessity as articulated by Appellants embodies no legitimate governmental purpose and, accordingly, does not balance in favor of upholding the Nonresident Lobster Law.
 
 
 45
 
 b. Conservation Interests
 
 
 
 46
 Related to the geographic necessity argument is Appellants' "preemptive" conservation justification, which fares no better here. In support of Appellants' position, and in opposition to the grant of summary judgment below, Fishers Island Amici emphasize conservation interests in preserving natural resources. They urge that New York's interest in conserving the lobster resources around Fishers Island is sufficient justification for the Nonresident Lobster Law to pass constitutional muster.
 
 
 47
 Bona fide conservation interests have long been recognized as a legitimate basis for legislation that curbs rights and are analogized to a State's interest in exercising its police power to protect the health and safety of its citizenry. See Hughes v. Oklahoma, 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (citing Firemen v. Chicago, R.I. & P.R. Co., 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968)). As an initial matter, we cannot help but observe that Appellants' efforts belie a pure conservation or preservation impetus. Casting the Nonresident Lobster Law as an effort to curb depletion of natural resources from without rings hollow in light of minimal efforts taken during all pertinent time periods to prevent depletion of the resource from within. Indeed, they bear a striking resemblance to South Carolina's proffered conservation interest in Toomer, which the Supreme Court also rejected.
 
 
 48
 Even if credited as bona fide, Appellants' proffered conservation interest falls short of striking the requisite nexus with the degree of discrimination exacted. Sustaining a discriminatory statute against a constitutional challenge on this basis requires the conservation interest to be unrelated to economic protectionism and to reflect more than simply generalized concerns about depletion of a natural resource. The interest must be supported by evidence of palpable and unique risks specific to the out-of-state interests sought to be excluded and must be narrowly drawn so as not to exceed the scope of the danger to be averted.
 
 
 49
 Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), a Commerce Clause case, is instructive here insofar as it provides a yardstick by which we measure the significance of purported conservation interests lying at the heart of discriminatory legislation. In Maine v. Taylor, conservation interests were found sufficiently compelling to uphold a facially discriminatory Maine law that prohibited importation of live baitfish into the State. The discriminatory law protected Maine's "unique and fragile fisheries" from the "significant threats" from parasites prevalent in out-of-state baitfish. No reasonably adequate alternatives were available, given the difficulties associated with inspecting shipments of imported baitfish for the deadly parasites.[13] Id. at 141-42, 106 S.Ct. 2440. In most instances, though, in light of the narrowed scope of State conservation interests deemed legitimate for purposes of defeating a constitutional challenge, discriminatory conservation laws are not sustainable when there are non-discriminatory alternatives by which conservation goals may be achieved. See, e.g., Hughes, 441 U.S. at 338, 99 S.Ct. 1727 (declaring unconstitutional, under the Commerce Clause, Oklahoma Minnow Statute because "nondiscriminatory alternatives would seem likely to fulfill the State's purported legitimate local purpose more effectively.").
 
 
 50
 Unlike the local purpose identified in Maine v. Taylor, Appellants identify no particularized evil presented uniquely by nonresident forces that warrants the degree of outright discrimination imposed. Appellants do not maintain that the health or safety or welfare of Fishers Island commercial lobstermen or residents are at risk from the activities of nonresident lobstermen. Appellants provide no evidence that a wholesale exclusion of nonresident lobstermen in the Restricted Area will prevent penetration into the coveted waters of a particularized hazard unique only to nonresident lobstermen that, if unabated, will pose grave danger to the lobster population or resident population in that area. Appellants merely allege that the Nonresident Lobster Law helps conserve the lobster population and is a preemptive strike of sorts designed to stave off the impending threat of inundation by nonresident commercial lobstermen. This justification manifests a generalized concern, the root of which is fairly attributable to the entire commercial lobstering industry whether or not the activity involves residents or nonresidents. Because Appellants identify no unique and particularized evil sought to be averted that is attributable only to nonresident commercial lobstermen, the proffered justification must be rejected.
 
 
 51
 Likewise, the local purpose of lobster conservation can be achieved by non-discriminatory alternatives. New York's conservation efforts fall far short of being the least discriminatory alternative for conserving Fishers Island lobsters. The Nonresident Lobster Law imposes no limits on the number of lobstering permits that may be issued to New York residents, the number of lobsters that may be trapped, or the number of traps that may be set by resident lobstermen.[14]
 
 
 52
 
 c. Enforcement Concerns
 
 
 
 53
 Finally, the enforcement concerns cited by State Amici cannot save this statute. State Amici purport to speak from experience when they contend that the present system of restricting lobstering permits to residents is the only enforceable and practicable system. State Amici reason that:
 
 
 54
 Enforcement of these [state lobster restriction] laws is, by and large, accomplished on the home port docks by fish and game officers inspecting holds and catches. It is virtually impossible for an official to approach a boat on open water and apprehend a lobsterman with an illegal catch or gear. When a lobsterman sees the marine patrol approaching from a distance, if he has an illegal catch or gear he will have ample time to throw it overboard. The only lobster fisheries law that can be effectively enforced on the open water is the requirement of a license. Amici State officials absolutely depend upon the fact that lobstermen return to their home port for effective enforcement of the States' conservation laws.
 
 
 55
 We do not dispute that tactics by non-compliant commercial lobstermen to avoid, evade or escape enforcement on the water complicate or impede enforcement efforts. Nor do we mean to suggest that the Nonresident Lobster Law does not play some role in facilitating enforcement efforts. But at what cost? Expediency, convenience, or ease of administration or enforcement do not justify constitutional infringement of privileges and immunities. C.f. Toomer, 334 U.S. at 406, 68 S.Ct. 1156 (on challenge to South Carolina statute, the Supreme Court held that "the importance of having commerce between the ... States flow unimpeded by local barriers persuades us that State restrictions inimical to the commerce clause should not be approved simply because they facilitate in some measure enforcement of a valid tax."). We will not craft a ruling upholding a constitutionally objectionable statute for the sole purpose of avoiding a parade of administrative horribles, particularly where, as here, the proffered justification leaves many questions unanswered.
 
 
 56
 The record contains no evidence from which we could reasonably conclude that Appellants would be unable to enforce the Nonresident Lobster Law as effectively at sea — akin to its enforcement efforts while patrolling trawler activities — as it does at the home port. For these reasons, Appellants have not demonstrated that non-discriminatory alternatives would be inadequate to meet their conservation, preservation, or enforcement objectives.
 
 
 57
 For the foregoing reasons, the Nonresident Lobster Law adversely affects Appellee Volovar's fundamental right to pursue a livelihood. In balancing, Appellants' proffered state interests do not justify the discriminatory treatment of nonresidents, particularly in light of less discriminatory alternatives available. Accordingly, we find the Nonresident Lobster Law violates the Privileges and Immunities Clause of Article IV and is unconstitutional as applied to nonresident commercial lobstermen.[15] Additionally, in light of the unqualified and unjustifiable exclusion of all nonresident commercial lobstermen from obtaining a permit to lobster in the Restricted Area, we are unable to foresee any circumstances under which this statute avoids a constitutional reckoning with the Privileges and Immunities Clause. Therefore, we hold the Nonresident Lobster Law is also unconstitutional on its face.[16] See Velazquez v. Legal Serv. Corp., 164 F.3d 757, 763 (2d Cir.1999) (to withstand facial challenge to Legal Services Corporation Act of 1974, this Court noted that it must "determine whether there are `any circumstances under which the prohibitions of the Act are permissible....'") (quoting Able v. United States, 88 F.3d 1280, 1290 (2d Cir.1996)).
 
 
 58
 The district court properly granted summary judgment to Appellee Volovar on her claim for declaratory and injunctive relief.
 
 
 59
 C. The Individual Appellants Are Entitled to Qualified Immunity
 
 
 60
 Appellee Volovar sued the individual Appellants (with the exception of Appellant Crotty) under 42 U.S.C. § 1983, both in their official capacities for purposes of obtaining declaratory and injunctive relief, and in their personal capacities for purposes of obtaining monetary damages.[17] Volovar alleged the individual Appellants violated her constitutional rights to travel freely among the States and to pursue her livelihood by their enforcement of the Nonresident Lobster Law. Appellants countered below, and reiterate on appeal, that qualified immunity is appropriate because the Nonresident Lobster Law was a presumptively valid statute with a long history of unchallenged enforcement and is mirrored by similar, and arguably more discriminatory, statutes in other States. Appellants maintain that their actions did not violate Volovar's constitutional right to pursue a lawful calling, but only incidentally interfered in furtherance of a purportedly substantial State interest. Alternatively, Appellants maintain that, even if violated, the right to pursue a livelihood in a limited geographic region was not clearly established at the time of enforcement. Finally, Appellants contend that it was not objectively unreasonable for them to enforce the Nonresident Lobster Law.
 
 
 61
 Disagreeing with Appellants, the district court denied qualified immunity after determining that Volovar's rights were clearly established at the time of enforcement and that Appellants' enforcement of the Nonresident Lobster Law was objectively unreasonable. With respect to the latter finding, the district court relied largely on the inconsistent policy positions regarding enforcement of the Nonresident Lobster Law and statements made by various Appellants questioning the constitutionality of the law.
 
 
 62
 The district court's conclusion is erroneous because it is grounded, in large part, in the court's view of Appellants' subjective beliefs and it fails to afford sufficient weight to the fact that Appellants were enforcing a presumptively valid statute. For the reasons discussed below, we conclude that each individual Appellant facing personal liability in this case was objectively reasonable as a matter of law in enforcing the Nonresident Lobster Law and, therefore, each is entitled to qualified immunity.
 
 1. Qualified Immunity, Generally
 
 63
 "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). The policy underpinnings of this doctrine involve "strik[ing] a balance `between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.'" Locurto v. Safir, 264 F.3d 154, 162-63 (2d Cir.2001) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 924-25 (2d Cir.1991)). Simply stated, qualified immunity ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
 
 
 64
 A threshold question for triggering the qualified immunity doctrine is whether an official's conduct violated a constitutional right. Katz, 533 U.S. at 201, 121 S.Ct. 2151. If so, we then must decide whether qualified immunity attaches. Qualified immunity is warranted if either (1) the official's actions did not violate clearly established law, or (2) even if the actions violated a clearly established law, the official was objectively reasonable in believing in the lawfulness of his actions. See Ford v. Moore, 237 F.3d 156, 162 (2d Cir.2001) (citing Salim v. Proulx, 93 F.3d 86, 92 (2d Cir.1996)). The presumption in favor of finding qualified immunity is necessarily high, protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
 
 
 65
 We resolved the threshold question by concluding above that enforcement of the Nonresident Lobster Law violates Appellee Volovar's fundamental right to travel among the States in pursuit of her livelihood. We need not decide here whether Volovar's rights were "clearly established" at the time of enforcement because even assuming they were, we conclude as a matter of law that it was not objectively unreasonable for the Appellants to enforce the Nonresident Lobster Law as they did.
 
 2. Objective Reasonableness
 
 66
 Although qualified immunity analysis is both fact-intensive and fact-specific, we have previously held that summary judgment on qualified immunity grounds is appropriate when a defendant shows that "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Ford, 237 F.3d at 162 (citing Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995)); accord Lederman v. United States, 291 F.3d 36, 46 (D.C.Cir. 2002) ("If existing law at the time of the violation `did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.'") (quoting Katz, 533 U.S. at 202, 121 S.Ct. 2151). We have also held that "[a]n officer's actions are objectively reasonable if `officers of reasonable competence could disagree on the legality of the defendants' actions.'" Ford, 237 F.3d at 162 (quoting Salim, 93 F.3d at 91).
 
 
 67
 In order to determine whether Appellee Volovar may prevail, we consider many factors, but rely primarily on one factor as particularly persuasive: that the challenged conduct involved enforcement of a presumptively valid statute. Our heavy reliance on this factor is supported by well-settled principles of judicial restraint and deference to the presumptive validity of legislative enactments. See New York State Club Ass'n v. City of New York, 487 U.S. 1, 17, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) ("Legislative classifications ... are presumed to be constitutional."); see also Lemon v. Kurtzman, 411 U.S. 192, 208, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (recognizing "`one of the first principles of constitutional adjudication — the basic presumption of the constitutional validity of a duly enacted state or federal law.'") (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 60, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring)). We also note that, notwithstanding potential or even foreseeable constitutional challenge, "[u]ntil judges say otherwise, state officers ... have the power to carry forward the directives of the state legislature," Lemon, 411 U.S. at 208, 93 S.Ct. 1463, and that "absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful," id. at 208-09, 93 S.Ct. 1463.[18]
 
 
 68
 Also informing our analysis is the Supreme Court's recognition, in a different context, that State officials "are charged to enforce laws until and unless they are declared unconstitutional" and that "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." Michigan v. DeFillippo, 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (reviewing probable cause determination by officers when making arrest under ordinance later ruled unconstitutional). Indeed, "[s]ociety would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." Id.
 
 
 69
 We see no reason why this principle is not applicable to the objective reasonableness question in qualified immunity analysis. See Lederman, 291 F.3d at 47 (relying on DeFillippo, 443 U.S. at 38, 99 S.Ct. 2627, in qualified immunity analysis). In Lederman, the D.C. Circuit invalidated, as an impermissibly broad encroachment on speech in a public forum, a Capitol Police Board regulation that imposed a demonstration ban near the United States Capitol steps. Capitol Police Officers who, in the course of enforcing the ban, arrested a lone demonstrator for distributing leaflets were nonetheless entitled to qualified immunity. Among other bases for this conclusion, the Court found enactment of the regulation "`foreclose[d] speculation by enforcement officers concerning its constitutionality,'" and, although unconstitutional, the ban bore sufficient indicia of attempts at narrow tailoring to "keep[] it from being `so grossly and flagrantly unconstitutional'... that the officers should have recognized its flaws." Lederman, 291 F.3d at 47 (quoting DeFillippo, 443 U.S. at 38, 99 S.Ct. 2627).
 
 
 70
 Other Circuit Courts have analyzed analogous situations similarly. In Grossman v. City of Portland, 33 F.3d 1200 (9th Cir.1994), for example, the Ninth Circuit invalidated a municipal ordinance prohibiting demonstrations in a public park without first obtaining a permit. The Court held that a local law enforcement officer arresting a demonstrator for non-compliance with this ordinance was nonetheless entitled to qualified immunity. It reasoned that "when a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority." Grossman, 33 F.3d at 1209. Absent evidence that the ordinance authorized "conduct which is patently violative of fundamental constitutional principles... an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability." Id. at 1209-10.
 
 
 71
 Similarly, in Swanson v. Powers, 937 F.2d 965 (4th Cir.1991), cert. denied, 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992), the Fourth Circuit held that the former North Carolina Secretary of Revenue was entitled to qualified immunity from personal liability for enforcing a discriminatory taxing scheme disadvantageous to retired federal civil service employees and active military personnel. The challenged conduct occurred from 1985 through 1988 and preceded a Supreme Court decision in Davis v. Michigan Dep't of the Treasury, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), invalidating a similar Michigan taxing scheme under the doctrine of intergovernmental tax immunity. In addition to finding Appellees' rights not clearly established at the time of enforcement, the Fourth Circuit reasoned that Appellant's enforcement of a presumptively valid statute on the books "may be `the paradigm' of objectively reasonable conduct that the grant of immunity was designed to protect." Swanson, 937 F.2d at 969 (quoting Landrum v. Moats, 576 F.2d 1320, 1327 n. 14 (8th Cir.), cert. denied, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978)). The Court held that "[a]bsent extraordinary circumstances, which are not present here, liability will not attach for executing the statutory duties one was appointed to perform." Id. at 969, 99 S.Ct. 282 (citing Lemon, 411 U.S. at 207-09, 93 S.Ct. 1463).
 
 
 72
 Without adopting any of the tests proposed by Lederman, Grossman, or Swanson as to when the enforcement of a presumptively valid statute is objectively unreasonable, we agree with the import of those cases insofar as they hold that enforcement of a presumptively valid statute, when lying at the heart of a damages claim, is entitled to comparatively greater weight than other factors in the reasonableness analysis. Common sense dictates that reasonable public officials are far less likely to conclude that their actions violate clearly established rights when they are enforcing a statute on the books with no transparent constitutional problems. Thus, in the realm of objective reasonableness, we hold that enforcement of a presumptively valid statute creates a heavy presumption in favor of qualified immunity.
 
 
 73
 The question, then, becomes whether the Nonresident Lobster Law was so plainly unconstitutional and its enforcement so clearly unlawful, in light of all facts and circumstances, that the presumption in favor of qualified immunity is overcome, whereby Appellants should be held personally liable for monetary damages. We think not, for the following reasons.
 
 
 74
 
 a. Balancing Is Not a Law Enforcement Responsibility
 
 
 
 75
 Denying qualified immunity to Appellants and subjecting them to civil liability under the facts of this case would necessarily imply that Appellants, as government officials, should have conducted the type of interest balancing that legislators are presumed to conduct when enacting legislation and that jurists necessarily conduct when reviewing legislation. This would demand too much from our government officials. It is well-established that the pursuit of a livelihood is a fundamental right, see Allgeyer, 165 U.S. at 589, 17 S.Ct. 427, and that individuals have a right to travel freely between states in pursuit of their livelihood, see Toomer, 334 U.S. at 396, 68 S.Ct. 1156. However, recognizing these general principles is of little utility in qualified immunity analysis. As we observed above, rights may be fundamental but nonetheless legitimately curbed by appropriately tailored and sufficiently justified legislation. And, as we have previously noted, a difficult but crucial task in this analysis involves "reasonably articulating the right in relation to the factual situation at hand." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251 (2d Cir.2001).
 
 
 76
 Conducting a balancing test reflects a recognition that there are no absolutes in constitutional law and the balancing process, like the narrowly tailoring process inherent in it, is "not an exact science." Lederman, 291 F.3d at 47; see also Dunn v. Blumstein, 405 U.S. 330, 342-43, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) ("legal `tests' do not have the precision of mathematical formulas."). Accordingly, a reasonable officer cannot be expected to perform that analysis prior to enforcing a statute on the books in the execution of his official duties. See id.
 
 
 77
 Likewise, we do not think an officer should be expected to preemptively cease enforcement in anticipation of subsequent invalidation of a statute. Much is expected of officials, who necessarily carry a heavy burden of executing on a daily basis the affairs of the State. While we require professionalism, however, we do not require prescience. Officials charged with enforcing a statute on the books, as the Appellants in this case were, are generally entitled to rely on the presumption that all relevant legal and constitutional issues have been considered and that the statute is valid. See Grossman, 33 F.3d at 1209. From the perspective of a reasonable government official similarly-situated to Appellants, and in light of the balancing process involved in determining the constitutionality of a law, the Nonresident Lobster Law was not so obviously unconstitutional at the time of enforcement as to support a conclusion that its enforcement was unreasonable.
 
 
 78
 
 b. Appellants' Official Duties Require Enforcement of the Nonresident Lobster Law
 
 
 
 79
 Related to the difficulties inherent in balancing interests — and certainly a factor to be considered in that balancing — is that all individual Appellants are charged with "enforc[ing] all provisions of the Fish and Wildlife Law and regulations pursuant thereto, and all laws relating to fish, wildlife,... shellfish [and] crustacea." Envtl. Conserv. Law § 11-0305(10). This is true of the most senior State policy-level official to the most junior enforcement officer. All officers within NYSDEC are similarly charged with enforcing all State laws relating to fish and wildlife. Id. §§ 71-0201, 71-0907.[19]
 
 
 80
 State operations are greatly dependent upon the dutiful enforcement of legislative enactments. Lemon, 411 U.S. at 207, 93 S.Ct. 1463 ("governments must act if they are to fulfill their high responsibilities"). NYSDEC officers, as agents of the State, have as their principal responsibility enforcement of New York's environmental conservation laws and furthering its constitutional and statutory environmental policy. See, e.g., N.Y. Const. art. 14, § 4; Envtl. Conserv. Law § 01-0101. An official is not only reasonable in enforcing a statute on the books, but is obligated by virtue of his official position to do so.
 
 
 81
 This is true despite the emphasis Appellee Volovar and the court below place on NYSDEC's inconsistent policy position in late 1997 regarding enforcement of the Nonresident Lobster Law. Volovar makes much of the fact that Appellants expressed concern about the constitutionality of the Nonresident Lobster Law and even ceased enforcement for a time. We do not find this change in policy to be fatal to Appellants' qualified immunity defense.
 
 
 82
 Ordinarily, determining whether official conduct was objectively reasonable "require[s] examination of the information possessed" by the officials at that time (without consideration of subjective intent). Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); see also Vega v. Miller, 273 F.3d 460, 466 (2d Cir.2001) (Qualified immunity analysis necessarily "requires consideration of the clarity of the law establishing the right allegedly violated and whether a reasonable person, acting under the circumstances then confronting a defendant, would have understood that the applicable law was being violated.") (emphasis added). On the other hand, we do not consider the subjective intent, motives, or beliefs of the officials, see Anderson, 483 U.S. at 641, 107 S.Ct. 3034.
 
 
 83
 At first blush, there is a certain amount of tension between the foregoing principles given the facts of this case. As the district court pointed out, the circumstances here include the fact that several of the Appellants questioned the Nonresident Lobster Law's constitutionality and received some legal advice suggesting that the statute would likely fail a constitutional challenge. Furthermore, Appellant Colvin expressed doubt about the validity of the law at the time when NYSDEC decided to cease enforcement and also mentioned the likelihood of litigation if enforcement continued. On the other hand, it appeared at or about the time of the December 15, 1997 meeting with Fishers Island residents that litigation could well ensue if enforcement did not resume. To the extent that the district court relied on the foregoing facts to discern the intent, motive or beliefs of Appellants, it erred. Qualified immunity analysis is necessarily objective. Inclusion of a subjective component, as the Supreme Court instructed, produces inconsistent results and defeats the purpose of the doctrine by creating a factual issue requiring resolution by a jury. Harlow, 457 U.S. at 815-16, 102 S.Ct. 2727.
 
 
 84
 However, the information that the Appellants possessed when they made the decisions not to enforce and then to recommence enforcement is a part of the mix in determining the objective reasonableness of those officials. We do not find that the information possessed by the Appellants at any period now under the judicial microscope would support a jury conclusion that Appellants' actions were objectively unreasonable. Although statements from one or more attorneys at the New York Attorney General's office regarding the Nonresident Lobster law carry some weight, we are not aware that the "determination" represented an official position of the Attorney General's office as do formal opinions issued by that office. Counterbalancing any informal "determination" by an attorney within the Attorney General's office, and certainly also known to Appellants, is the fact that the Nonresident Lobster Law had never been legislatively repealed or judicially invalidated. Thus, we conclude that any apparent inconsistency in NYSDEC's official position could only reflect continuing uncertainty over the validity of the Nonresident Lobster Law.
 
 
 85
 Appellee Volovar argues that Appellants were sufficiently on notice that the Nonresident Lobster Law was unconstitutional in light of cases invalidating the Nonresident Shellfish Law. We disagree. First, the Nonresident Shellfish Law imposed an outright bar on any nonresident commercial shellfishing in any portion of New York waters while the Nonresident Lobster Law only barred nonresident commercial lobstering in a specific geographic area of New York waters. While a distinction without a difference insofar as our Privileges and Immunities analysis is concerned, this distinction is sufficient to muddy the waters for purposes of qualified immunity by casting doubt in the minds of reasonable officials about whether invalidation of the Nonresident Shellfish Law would translate into invalidation of the Nonresident Lobster Law.[20]
 
 
 86
 This conclusion is reinforced by the fact that the New York legislature apparently did not perceive the two statutes as particularly analogous either. After a challenge to the residence requirement in the Nonresident Shellfish Law, the legislature deleted the provision. It made no move to repeal the same language in the Nonresident Lobster Law despite the fact that the instant litigation had commenced in 1998, prior to the effective date of the amendments to the Nonresident Shellfish Law. A reasonable person standing in Appellants' shoes could construe the inaction as purposeful.
 
 
 87
 Thus, the inconsistent positions reflect the dilemma confronting NYSDEC officials of having to choose between two equally hazardous (and potentially litigious) alternatives, forcing the Appellants to navigate between the veritable "Scylla and Charybdis": on the one hand, enforce, pursuant to official duties, a potentially (although not plainly) unconstitutional statute; or, on the other hand, opt not to enforce, in possible dereliction of official duties, a potentially (although not clearly) constitutional statute. Such is certainly a precarious and unenviable position to find oneself in, particularly where the stakes may be high on both fronts.[21]
 
 
 88
 In this case, enforcing the Nonresident Lobster Law carried the potential for litigation from nonresident lobstermen; not enforcing the restrictions carried the potential for litigation by resident lobstermen.[22] Regardless of how one views the virtues of selecting either option available to NYSDEC, no good deed would have gone "unpunished." Without a clear legislative mandate or judicial order invalidating the Nonresident Lobster Law, the individual Appellants erred on the side of caution and relied upon the Nonresident Lobster Law's presumptive validity. We conclude that, at the very least, "officers of reasonable competence could disagree on the legality" of Appellants' actions. Ford, 237 F.3d at 162. Therefore, the decision was objectively reasonable under the circumstances and qualified immunity attaches.
 
 
 89
 
 c. Historical Enforcement of the Nonresident Lobster Law and Similar Statutes from Neighboring States
 
 
 
 90
 The lineage of the Nonresident Lobster Law supports the conclusion that it was reasonably presumed valid at all pertinent times. The Nonresident Lobster Law had been in effect in its current form since 1964, see 1964 N.Y. Laws 406, § 1, and had been in effect in substantially the same form since 1911, see N.Y. Conservation Law of 1911, ch. 647, § 316. No version of the Nonresident Lobster Law had faced a constitutional challenge despite the vast number of nonresident lobstermen affected over the years and, consequently, it was continually enforced until 1997 without judicial invalidation or legislative repeal. Ultimately, after consultation with State legislators and NYSDEC officials in December 1997 — including the legislators and/or their representatives who represent the Fishers Island district — NYSDEC renewed its enforcement efforts of this provision.
 
 
 91
 Finally, the Nonresident Lobster Law was identical or substantially similar to — but arguably less restrictive than — comparable lobstering statutes in neighboring states effective at that time. Most notably, throughout the pertinent time period continuing to the present, Connecticut prohibits commercial lobstering by declining to grant a commercial lobstering permit to any resident of a State that does not grant reciprocal lobstering privileges for Connecticut residents.[23] See Conn. Gen.Stat. Ann. § 26-142a. New York's Nonresident Lobster Law was effectively the product of negotiations between New York and Connecticut regarding respective rights of either State's residents to take and land lobsters in the other State's waters.
 
 
 92
 Other neighboring States had similar statutes on the books at the time that impose an outright bar on nonresident commercial lobstering in any portion of their waters. Maine, for example, issues its commercial lobstering permits, designated as Class I, Class II, and Class III, only to Maine residents, see Me.Rev.Stat. Ann. tit. 12, § 6421(5) (West 1997), as does Rhode Island, see R.I. Gen. Laws § 20-2-24(a) (1992). Massachusetts and New Hampshire impose durational residence requirements on issuance of lobster licenses. Massachusetts issues its commercial lobster licenses only to individuals who have resided in Massachusetts for at least one year prior to application, see Mass. Gen. Laws ch. 130, § 38 (1999), while New Hampshire requires at least five years residency to be eligible for any type of lobster license, see New Hampshire Rev. Stat. Ann. § 211:23 (1977).
 
 
 93
 In light of all facts and circumstances in this case, we conclude that Appellants were objectively reasonable as a matter of law in relying on the presumptive validity of the Nonresident Lobster Law and enforcing its permitting restriction during all pertinent times. Neither plainly incompetent nor knowingly violating any law, Appellants are entitled to qualified immunity in connection with Appellee Volovar's claim for monetary damages. Because the district court denied qualified immunity to the Appellants, we find it erred. Accordingly, we reverse and enter summary judgment in favor of the Appellants in their individual capacities on qualified immunity grounds.
 
 III. CONCLUSION
 
 94
 For the reasons stated above, we conclude that the Nonresident Lobster Law violates the Privilege and Immunities Clause of Article IV of the United States Constitution. We therefore affirm the district court's grant of summary judgment for Appellee Volovar based on that portion of the Order finding the Nonresident Lobster Law unconstitutional and enjoining its enforcement. We also find the Nonresident Lobster Law is facially invalid under the Privileges and Immunities clause and is thus unenforceable under any reasonable construction. As such, Appellee Connecticut's dormant Commerce Clause challenge is moot. On the other hand, Appellants are entitled to qualified immunity with respect to the portion of Appellee Volovar's claims that seek monetary damages. We reverse that portion of the district court's judgment denying qualified immunity on Appellee Volovar's damages claim and enter summary judgment for the individually-named Appellants on qualified immunity grounds. Costs are to be awarded to Appellee Volovar.
 
 
 
 Notes:
 
 
 *
 Erin M. Crotty became the Commissioner, Department of Environmental Conservation, effective March 28, 2001, to succeed John P. Cahill. Under Fed.R.Civ.P. 25(d)(1), Crotty, in her official capacity, is automatically substituted as a defendant in this action. Cahill remains a named defendant in his individual capacity
 
 
 **
 The Honorable Fred I. Parker, who was a member of the panel, passed away on August 12, 2003. Prior to his death, Judge Parker participated in the consideration and decision of this case
 
 
 ***
 Judge Parker was the principal author of the opinion of the Court
 
 
 [1]
 See 1964 N.Y. Laws 406, § 1. A substantially similar provision existed from 1911. See N.Y. Conservation Law of 1911, ch. 647, § 316.
 
 
 [2]
 We note that the constitutionality of Envtl. Conserv. Law § 13-0329(1),et seq., has previously come before us, but in connection with the 1991 Amendments to the law prohibiting trawlers from taking, landing, or possessing lobsters altogether. See New York State Trawlers Ass'n v. Jorling, 16 F.3d 1303 (2d Cir.1994). This Court acknowledged in passing the differential treatment of residents and non-residents regarding issuance of lobster permits under the Nonresident Lobster Law for taking and landing lobsters by setting lobster pots, but was only presented with determining the constitutionality of a nondiscriminatory, evenhanded prohibition on resident and non-resident trawlers taking lobsters. In that case, we upheld the amendments against Commerce Clause, Equal Protection, Due Process, and Bill of Attainder challenges.
 
 
 [3]
 As discussed in greater detail in our qualified immunity analysis,see infra, Part II.D., the authority for Appellants' statutory enforcement duties can be found at, for example, Envtl. Conserv. Law §§ 11-0305(10), 71-0201, and 71-0907.
 
 
 [4]
 Reiterating what we noted inCahill I, 217 F.3d at 96 n. 1, counsel at oral argument informed us that women involved in commercial lobstering prefer to be called "lobstermen."
 
 
 [5]
 Appellee Connecticut also appeared as Amicus Curiae inVolovar v. Cahill, but submitted no brief.
 
 
 [6]
 It is unclear from the record the formality of the Attorney General's "determination" regarding the Nonresident Shellfish Law. The determination came during litigation challenging the Nonresident Shellfish LawSee Diemer v. Koetzner, No. 28471-96 (N.Y.Sup. Ct. May 29, 1997). On May 29, 1997, the parties in Diemer stipulated that the Nonresident Shellfish Law was unconstitutional. The state court agreed and issued an Order and Stipulation decreeing the Nonresident Shellfish Law unconstitutional. In 1999, the New York State legislature deleted the durational residence requirement from the Shellfish Permit Law, but added a disparate taxing scheme on resident and non-resident shellfishers.
 
 
 [7]
 Appellant Brewer's reference to "the previously adjudicated case" is most likely toDiemer, No. 28471-96 (N.Y.Sup.Ct. May 29, 1997). As with the Attorney General's determination regarding the Nonresident Shellfish Law, the formality of its determination to Appellant Brewer regarding the Nonresident Lobster Law is unclear as well.
 
 
 [8]
 No minutes were taken, nor have Appellants admitted to any specific topic discussed other than the general issue of enforcement or nonenforcement of the Nonresident Lobster Law. Appellants admit that the handwritten notes were taken by a NYSDEC employee, official, or agent
 
 
 [9]
 The Appellants maintain that they have no specific recollection of Assemblywoman Acampora discussing the intention of others to sue
 
 
 [10]
 The notes read as follows: "There are few eastern Conn[ecticut] comm[ercial] lobstermen who would fish Fishers Island restricted waters with their non-resident comm[ercial] permits."
 
 
 [11]
 The notes stated that "voluntary pot limit is less than 500 among Fishers Island residents."
 
 
 [12]
 In a footnote in her brief, Appellee Volovar contends the present appeal is untimely under Fed. R.App. P. 4(a). Volovar claims the date of entry of Judgment was February 2, 2001, and that Appellants filed no Notice of Appeal until March 8, 2001. Although the date stamp on the district court's order indicates that it was "filed" on February 2, 2001, and although the order itself notes that it is "dated the 2nd day of February 2001," the date that we construe as memorializing the date on which judgment was entered and executed is the date on which judgment was entered on the docket of the district courtSee Fed. R.Civ.P. 58; Fed.R.Civ.P. 79(a); see also Houston v. Greiner, 174 F.3d 287, 288 (2d Cir.1999) ("`Entry of judgment,' which is required by Fed.R.Civ.P. 58, is the act of recording in a docket maintained by the clerk of a court the fact that a judgment has been rendered. See Fed.R.Civ.P. 79(a). The `entry' date is not necessarily the same date that the judgment is dated, i.e., signed by the judge or court clerk, nor the same date that it is filed, i.e., date and time-stamped as officially received by the clerk's office...."). Here, the civil docket shows that the entry date of the district court's Memorandum Decision and Order was February 6, 2001. The Notice of Appeal — separately served on each Appellee on March 8, 2001 — was served within thirty days of the entry of judgment. See Fed. R.App. P. 26(a). Accordingly, the appeal is timely. See Fed. R.App. P. 4(a)(1)(A).
 
 
 [13]
 The record evidence inMaine v. Taylor showed that, unlike the standardized statistical sampling and inspection techniques for detecting parasites in salmonids (salmon and trout), "no such scientifically accepted procedures of this sort were available for baitfish." Id. at 142, 106 S.Ct. 2440. Indeed, ensuring parasite-free baitfish required their individual destruction and testing. Thus, nothing short of a wholesale ban on importation of baitfish would prevent the particularized danger identified by Maine.
 
 
 [14]
 Envtl. Conserv. Law § 13-0329(1) makes explicitly clear that resident commercial lobster permit holders are not limited in the number of lobster traps they are permitted to set. Although the handwritten notes from the December 15, 1997 meeting suggest the Fishers Island lobstermen agreed to a voluntary self-imposed lobster pot limit as part of a "lobster conservation area approach," there is no evidence that any such limitation was imposed
 
 
 [15]
 Although the district court examined the Nonresident Lobster Law under Appellee Volovar's other challenges under the Privileges and Immunities Clause and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, we need not do so here. Having determined the Nonresident Lobster Law is constitutionally infirm under the Privileges and Immunities Clause of Article IV dispenses with any need for scrutiny under any other constitutional provisions
 
 
 [16]
 As stated above, having determined the Nonresident Lobster Law facially unconstitutional under Article IV's Privileges and Immunities Clause, we need not address Appellee Connecticut's dormant Commerce Clause challenge, which is moot in light of our holding
 
 
 [17]
 The district court correctly ruled that, insofar as Appellee Volovar asserted her claim for monetary damages against Appellants in their official capacities, the State of New York is the real party in interest and monetary damages are barred by the Eleventh Amendment to the United States ConstitutionSee Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that States are immune from damages suits in federal court that "seek[] to impose a liability which must be paid from public funds in the state treasury....").
 
 
 [18]
 AlthoughLemon involved, inter alia, questions about the propriety of certain equitable remedies, not qualified immunity analysis, the foregoing principles have also been recognized as driving factors in qualified immunity doctrine. See, e.g., Swanson v. Powers, 937 F.2d 965, 969 (4th Cir.1991), cert. denied, 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992) (relying on Lemon).
 
 
 [19]
 Envtl. Conserv. Law § 71-0201 provides that "[e]very police officer and any employee of [NYSDEC] as may be designated by the commissioner, shall enforce the provisions of this chapter, and the rules, and regulations and orders enacted or promulgated thereunder." We do not mean to suggest that enforcement of a particular statute is simply a ministerial act devoid of any discretionary component. At least in New York, officials have discretion whether and how to enforce statutes, absent a clear constitutional mandate to the contrarySee Gaynor v. Rockefeller, 15 N.Y.2d 120, 131, 256 N.Y.S.2d 584, 204 N.E.2d 627 (N.Y.1965). Discretion is a predicate element for qualified immunity. See Harlow, 457 U.S. at 800, 102 S.Ct. 2727. The extent of the discretion to be exercised in deciding whether to enforce a statute, however, is narrowly circumscribed by, among others, interests of efficient government administration.
 
 
 [20]
 In discussing the import of Appellants' concerns about enforcing the Nonresident Lobster Law, the district court referred toHassan v. Town of East Hampton, 500 F.Supp. 1034 (E.D.N.Y.1980), as suggesting that the information available to Appellants confirmed that the Nonresident Lobster Law was unconstitutional. However, Hassan, incorrectly referred to by the district court as a "Second Circuit decision," invalidated under the equal protection clause a local shellfishing ordinance containing a durational residence requirement which was modeled after New York's Nonresident Shellfish Law. For the same reasons as stated above comparing New York's Nonresident Shellfish Law and Nonresident Lobster Law, we hold that invalidation of the local shellfishing ordinance in Hassan would not necessarily lead a reasonable official to doubt the constitutionality of the Nonresident Lobster Law from that point forward.
 
 
 [21]
 Alleviating this conundrum as much as possible is what served as the initial impetus for the Supreme Court to recognize qualified immunity for officials enforcing presumptively valid statutes. InPierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court explained:
 A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as applied.
 Id. at 555, 87 S.Ct. 1213 (footnote omitted).
 
 
 [22]
 This was a concern to Appellants, as evidenced by an e-mail from Appellant Colvin to a NYSDEC attorney and other NYSDEC officials, dated November 24, 1997. Appellant Colvin sought legal review of a draft letter to Dan Doyen of the Fishers Island Lobstermen's Association responding to inquiries about enforcement of the permit restrictions. This letter was ultimately dated November 25, 1997 and mailed to David C. Denison, President, Fishers Island Lobstermen's Association. The significance of this letter stems from Appellant Colvin's recapitulation of a conversation with Doyen. Colvin emphasized that FILA "want[ed] a written answer to the letters asap, andI suspect from what [Colvin] said that this reply [the November 25, 1997 letter] will become exhibit 1 in a lawsuit they are planning to file to attempt to force DEC to enforce the law."
 
 
 [23]
 Connecticut's version of a Nonresident Lobster Law provides, in pertinent part:
 The fee for the following fishing licenses and registrations and for a commercial fishing vessel permit shall be: ... (3) for a license to take lobsters or crabs ... by the use of more than ten lobster pots or similar devices, one hundred fifty dollars for residents of this state and two hundred twenty-five dollars for nonresidents, provided any such license issued to a resident of a state that does not issue commercial licenses conferring the same authority to take lobsters to residents of Connecticut shall be limited to the taking of crabs, other than blue crabs, and a nonresident shall not be issued such license if the laws of the nonresident's state concerning the taking of lobster are less restrictive than regulations adopted pursuant to section 26-157c....
 Conn. Gen.Stat. Ann. § 26-142a(c)(3) (West 2003) (emphasis added).